**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>ZELALEM BERHE,<br><br>                    Defendant. | Case No. 2:10-cr-00410-GMN-GWF<br><br>**FINDINGS & RECOMMENDATIONS**<br><br>**Motion to Suppress - #33** |

This matter is before the Court on Defendant Zelalem Berhe's Motion to Suppress Evidence for Fourth Amendment Violation (#33), filed on March 17, 2011; the Government's Opposition to Defendant's Motion to Suppress (#41), filed on April 7, 2011; and Defendant's Reply to Government's Opposition to Motion to Suppress (#42), filed on April 13, 2011. The Court conducted an evidentiary hearing in this matter on May 19, 2011.

**FACTUAL BACKGROUND**

The indictment in this case charges Defendant Berhe with bank fraud in violation of 18 U.S.C. § 1344, possession of fifteen or more counterfeit and unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3), possession of device making equipment in violation of 18 U.S.C. § 1029(a)(4), aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) and aiding and abetting in violation of 18 U.S.C. § 2. The instant motion to suppress concerns evidence that was discovered and seized as a result of two police traffic stops of vehicles operated by Defendant Berhe. The first traffic stop occurred on February 7, 2010. The second stop occurred on May 4, 2010.

    **1.**    **February 7, 2010 Traffic Stop:**

North Las Vegas Police Officer Gregory Blackwell testified that he has been employed as a

police officer for 10 years.  His police academy and other training has included instruction in credit card fraud crimes.  On February 7, 2010, Officer Blackwell was on routine patrol in a marked police car.  As part of his routine patrol, Officer Blackwell conducts random computer checks on vehicles that he observes.  On this day, he observed a silver Ford Expedition, with a California license plate, traveling westbound on Lake Mead Boulevard just east of Las Vegas Boulevard North.  He conducted a computer records check on the license plate which indicated the vehicle's registration was suspended.  Officer Blackwell thereupon conducted a traffic stop on the vehicle and parked behind it.  Officer Blackwell made contact with Defendant Berhe who was the sole occupant of the vehicle.  He requested Mr. Berhe's driver's license, the vehicle registration and proof of insurance, which the Defendant provided.  Mr. Berhe told Officer Blackwell that the vehicle was a "loaner vehicle" that belonged to an individual named Harry.  Mr. Berhe could not recall Harry's last name.  Officer Blackwell returned to his patrol vehicle to obtain a records check on Mr. Berhe and the vehicle.  The records check on the vehicle indicated that the owner had a different name than "Harry."  The records check also revealed that Mr. Berhe's driver's license was suspended and that Mr. Berhe had a prior criminal record, including theft related charges and that Mr. Berhe was "registered federally for fraudulent acts."

      Officer Blackwell testified that it is standard procedure to wait until a second officer is present to provide back-up support before having the driver or passenger(s) exit the vehicle.  In this case, North Las Vegas Police Officer Steven Sharp arrived at the traffic stop scene to provide back-up after Officer Blackwell had completed the records check.  Officer Blackwell instructed Mr. Berhe to exit his vehicle and had him come back to the front of the officer's patrol car so that Officer Blackwell could further question him about the vehicle.  Mr. Berhe told Officer Blackwell that his own vehicle had broken down due to overheating and that he had taken it to a repair shop in California known as High Tech Auto.  Mr. Berhe stated that Harry of High Tech Auto gave him the Ford Expedition to use as a "loaner" while his vehicle was being repaired.  Mr. Berhe provided Officer Blackwell with Harry's phone number.   Officer Blackwell called the phone number and spoke with Harry who confirmed that Mr. Berhe's vehicle was in the shop for transmission work and that he had provided the Expedition to him as a loaner.  Harry could not tell the officer the

name of the registered owner. He stated that the owner's name was on some paperwork in the shop which he apparently could not access. Harry further told Officer Blackwell that the actual owner of the vehicle was a third person who was out of the country.

      Officer Blackwell testified that he decided to impound the vehicle based on the uncertain information provided by Mr. Berhe and Harry concerning its ownership and because of his doubt as to whether the vehicle's lawful owner had given permission for Mr. Berhe to use the vehicle. He testified that as a matter of policy, a driver with a suspended driver's license is not permitted to drive the vehicle away at the conclusion of a traffic stop. It is also police department policy to impound a vehicle when the police cannot determine who the lawful owner is and that the person operating the vehicle has the owner's permission to do so. Officer Blackwell further testified that when the decision is made to impound a vehicle, a full inventory search of the vehicle is conducted before the vehicle is towed from the scene by the towing company. The purpose of the inventory search is to make sure that nothing of value in the vehicle disappears after it is impounded. Officer Blackwell also testified that it is policy or practice to search closed containers found in the vehicle to be impounded before turning them over to the driver or occupants in order to make sure that no weapons are in the containers. He also stated that the contents may be examined to determine if the person is the owner or entitled to possession of them.

      Officer Blackwell testified that he instructed Officer Sharp to conduct an inventory search of the vehicle. While Officer Sharp conducted the inventory search, Officer Blackwell continued to talk to Defendant Berhe who asked if he could retrieve some laptop computers from the vehicle. Officer Sharp thereafter showed Officer Blackwell two laptop computers that he had retrieved from the vehicle, together with an object that Officer Blackwell recognized as "a credit card encoder device" which can be used to unlawfully encode an account holder's number onto a credit card. Officer Sharp also told Officer Blackwell that he had found numerous unopened credit card gift cards inside the carrying case for one of the laptop computers. In addition, Officer Sharp found a health card and a TAM card in the case which had Mr. Berhe's name and photograph on them. There was also an airline ticket receipt with Mr. Berhe's name on it and a misdemeanor traffic citation issued to Mr. Berhe in the case. Officer Blackwell testified that the discovery of the credit

3

card encoding device and the numerous credit card gift cards, combined with the information he had obtained about Mr. Berhe's criminal record, made him very suspicious that Mr. Berhe was engaged in criminal activity. Officer Blackwell stated that the number of credit card gift cards appeared excessive for one individual to have and it is also unusual for an individual to be in possession of a credit card encoding device.

Officer Blackwell testified that he advised Mr. Berhe of his *Miranda* rights by reading them from a card that Officer Blackwell carries on his person. Mr. Berhe stated that he understood his rights and Officer Blackwell proceeded to question him about the computers, the gift cards and the credit card encoder device. Mr. Berhe stated that the items did not belong to him, notwithstanding his earlier request that he be allowed to retrieve the computers. Mr. Berhe stated that numerous people had been in and out the vehicle. He also stated that the items were in the vehicle when he got it. Officer Blackwell asked Mr. Berhe whether he had touched any of the items. Mr. Berhe initially stated that he may have touched the items, but then stated that he had not touched them. Officer Blackwell placed Mr. Berhe under arrest and conducted a search of his person during which he found eight additional credit card gift cards.

North Las Vegas Police Officer Steven Sharp testified that he was working in a marked patrol vehicle on February 7, 2010 and assisted Officer Blackwell during the traffic stop involving Mr. Berhe. Officer Sharp could not recall whether he was specifically requested to provide back-up for Officer Blackwell or whether he simply stopped after observing the stop under way. He did not recall whether Mr. Berhe was inside his vehicle when he arrived on the scene. Officer Sharp also stated that it is department policy not to remove a person from his or her vehicle until a second officer is present to provide back-up support. Officer Sharp stated that he parked behind Officer Blackwell's vehicle. Officer Blackwell told him that he intended to impound Mr. Berhe's vehicle and asked Officer Sharp to inventory the vehicle. Officer Blackwell also told him that the vehicle's registration was suspended and that Mr. Berhe's driver's license was also suspended. On cross-examination, Officer Sharp testified that he did not see Officer Blackwell speaking on his cell phone.

. . .

Officer Sharp did not recall whether he began the inventory search on the driver's side or passenger side of the vehicle. He stated that it is his usual practice to begin on the driver's side. (It was Officer Blackwell's recollection that Officer Sharp began the inventory from the passenger side of the vehicle.) Officer Sharp stated that he found a Compac laptop computer on the passenger side floorboard and a Sony laptop computer in a carrying case on the rear seat. He did not recall whether the carrying case's zipper was open or closed. In either event, he opened the case and looked inside but did not remove the computer. Officer Sharp testified that he searched the case to make sure that there were no weapons or narcotics that might be released to the vehicle driver. He stated that another reason for inspecting the contents of a container is to determine if the vehicle's driver or occupant is entitled to possess the items. Officer Sharp stated that at the time he conducted the inventory search, he believed that the stop involved only a traffic offense and that the driver would be permitted to leave once the stop was concluded. He therefore thought that articles found in the vehicle might be released to the driver before the vehicle was towed.

Officer Sharp confirmed that he found the TAM card with Mr. Berhe's photograph and name, and the misdemeanor citation and the airline receipt in Mr. Berhe's name in the computer case. He also stated that numerous unopened credit card gift cards were in the case. Officer Sharp testified that he found an electronic device in the rear storage area of the vehicle, but did not know what the device was. He showed the gift cards and the electronic device to Officer Blackwell. Officer Blackwell took the device back to his vehicle. Officer Sharp stated that he did not speak to Mr. Berhe during the inventory search and he did not hear or recall any statements that Mr. Berhe made after he was advised of his *Miranda* rights.

Officer Sharp filled out a written vehicle impound form which was admitted as Defendant's Exhibit A. He testified that the purpose of this form is to list the particular equipment on the vehicle, e.g. radios, tires, hubcaps, etc., and the personal property that will remain with the vehicle when it is towed to the impound yard. The form is signed by the tow truck driver when he takes possession of the vehicle. Officer Sharp listed the Sony laptop Computer, the Compac laptop computer and 37 VISA $100 gift cards on this impound form. Officer Sharp testified that he drew a line through the Compac laptop. He also testified that although these items were listed on the

impound form, the two laptop computers and the gift cards did not go with the vehicle when it was towed to the impound yard. These items were instead seized as evidence by the officers and were placed in the police department's evidence vault.

      Defendant Berhe testified that after he was pulled over, Officer Blackwell informed him that the license plate on the vehicle was suspended. Mr. Berhe provided Officer Blackwell with his driver's license, the vehicle's registration and proof of insurance that Mr. Berhe had obtained for his own insurance coverage. Officer Blackwell took these papers back to his patrol car. Mr. Berhe testified that after Officer Blackwell returned to Mr. Berhe's vehicle, he asked for permission to search the car. Mr. Berhe told him no. Officer Blackwell then told Mr. Berhe that his driver's license was suspended, to which Mr. Berhe responded: "I didn't know." Officer Blackwell instructed him to step out of his car and to follow him back to the patrol car. Mr. Berhe testified that Officer Sharp had not yet arrived on the scene when Officer Blackwell had him exit the vehicle. Officer Blackwell asked Mr. Berhe who owned the car and how he obtained possession of it. Mr. Berhe testified that he provided Officer Blackwell with his cell phone which had the phone number for the person who loaned him the car, i.e. Harry. Officer Blackwell called the number and spoke with Harry. Mr. Berhe heard Officer Blackwell tell Harry that he could not let Mr. Berhe drive the car because his license was suspended and the registration was suspended and that he might have to tow the car.

      About that time Officer Sharp arrived on the scene. Mr. Berhe appeared to testify that Officer Sharp parked his patrol car in front of the Expedition and not behind Officer Blackwell's police car as Officer Sharp stated. Mr. Berhe testified that after Officer Sharp got out of his vehicle Officer Blackwell nodded to him and Officer Sharp went to the driver's side of Mr. Berhe's car and entered the vehicle. Mr. Berhe stated there was no conversation between Officer Blackwell and Officer Sharp before the latter started searching his car. Mr. Berhe told Officer Blackwell that he had not given him permission to search his vehicle and he asked why the other officer was searching the vehicle. Officer Blackwell told him that they were doing an inventory search.

      Mr. Berhe testified that he did not ask Officer Blackwell for the laptop computers or any other items that were in the vehicle. He also stated that Officer Sharp did not bring the laptops or

other items to Officer Blackwell.  Instead, Officer Sharp said something to Officer Blackwell which Mr. Berhe could not hear.  Officer Blackwell then went over to the Expedition and looked at something inside the vehicle.  Officer Blackwell came back to Mr. Berhe and told him what had been found in the vehicle and asked him if he knew anything about it.  Mr. Berhe said no.  Officer Blackwell referred to the items in the "briefcase" and told Mr. Berhe: "I know its yours."  Officer Blackwell also told Mr. Berhe that he had been arrested for this kind of stuff before and that he was going to jail that night.  Officer Blackwell read Mr. Berhe his rights, and then retrieved the laptop computers and the decoder from the Expedition and placed them in his patrol car.  He then took Mr. Berhe to jail.

### 2. May 4, 2010 Traffic Stop:

The second stop occurred on May 4, 2010 in Las Vegas, Nevada.  Officer Spencer Basner testified that he has been employed as a police officer with the Las Vegas Metropolitan Police Department for six years.  He received standard training as a police officer, including training regarding fraud and credit card fraud crimes.  Officer Basner testified that on May 4, 2010, he was on routine patrol in a marked police car.  He was driving westbound on Tropicana Avenue near Lindell Street when he observed a Hummer vehicle in the number one travel lane on westbound Tropicana.  He observed the Hummer move from the number one travel lane into the center turn lane without displaying a turn signal.  The driver then made a left turn onto southbound Red Rock Street again without displaying a left turn signal. (Red Rock Street is approximately a quarter mile west of Lindell Street.)   Officer Basner followed the Hummer and initiated a traffic stop by activating the patrol car's emergency lights and siren.  Officer Basner could not recall whether he ran the vehicle registration before he pulled the vehicle over.

Officer Basner testified that he made contact with the driver, Mr. Berhe.  Mr. Berhe provided his Nevada driver's license to the officer.  Officer Basner also asked Mr. Berhe for the vehicle registration and proof of insurance.  Mr. Berhe was unable to provide proof of insurance. Officer Basner then asked Mr. Berhe if he had previously been arrested.  He testified that this is a standard question that he asks during traffic stops.  Mr. Berhe responded no.  Officer Basner returned to his patrol car and ran a computer check on Mr. Berhe and the vehicle.  The records

check revealed that Mr. Berhe had been arrested many times and had a felony conviction. Officer Basner returned to Defendant's vehicle and asked him why he had lied to him about his arrest record. Defendant did not give any answer.

Officer Basner testified that he then asked Mr. Berhe for permission to search him and his vehicle. Mr. Berhe said "Yes. You can search me." Officer Basner asked Mr. Berhe to step out of his vehicle and took him back to the front of the patrol car where he conducted the search of Defendant's person. Officer Basner acknowledged on cross-examination that he had consent to search forms in his patrol car. He did not ask Mr. Berhe to sign a consent to search form. He also acknowledged that prior to obtaining Mr. Berhe's consent to search his person, he did not have probable cause to search him.

Officer Basner testified that he found a large stack of twenty dollar bills in Defendant's right front pocket. Mr. Berhe told him that it was approximately $1,500.00. Officer Basner asked Defendant if he was working and Mr. Berhe said no. Officer Basner found a circuit board with wire leads in Mr. Berhe's left front pocket. He asked Mr. Berhe what the object was and Mr. Berhe responded that it looked like a gaming device. Officer Basner testified that prior to this stop, he had received training about credit card skimming devices and he recognized the object as a skimming device. Because Mr. Berhe's criminal record indicated that he had a conviction for a fraud crime, Officer Basner contacted dispatch and requested a detective from the fraud unit. Dispatch gave him the phone number for Detective Beatty. Officer Basner called Detective Beatty and informed him of the situation. Officer Beatty arrived at the stop location within approximately fifteen minutes of this call.

Officer Basner testified that he decided to arrest Mr. Berhe for the traffic violations because of Defendant's prior criminal record of traffic offenses and failures to appear relating to such charges. Officer Basner produced a copy of the Las Vegas Metropolitan Police Department's written policy regarding the officer's discretion to arrest an individual for a misdemeanor offense rather than issue a citation. *Government's Exhibit 1*. Officer Basner testified that pursuant to the policy an officer may arrest the individual if the officer has reason to believe he will not keep a written promise to appear in court. A copy of Defendant's criminal history record ("SCOPE") was

admitted into evidence. *Government's Exhibit 3*. Officer Basner acknowledged on cross-examination that the failures to appear date back to 1987 and that the most recent failure to appear occurred in December 2001.

Officer Basner testified that he would have arrested Mr. Berhe even if Defendant had not given him consent to search his person and the officer had not found the circuit board device. He also testified that he would have conducted a search incident to arrest (if he had not already done so). Defendant would also have been searched once he arrived at the jail. Officer Basner therefore testified that it was inevitable that the police would have found the circuit board/skimming device on Mr. Berhe's person.

Officer Basner testified that Defendant Berhe was sitting on the curb when Detective Beatty arrived. Officer Basner gave Detective Beatty a run-down on what had occurred. He showed the detective the circuit board with the lead attached to it. Detective Beatty agreed that it appeared to be a skimming device. The officers then impounded Defendant's vehicle and conducted an inventory search. No contraband or items of evidentiary value were found in the vehicle. Officer Basner did not advise Mr. Berhe of his *Miranda* rights, and Defendant did not make any statement to him after he was arrested.

Defendant's counsel showed Officer Basner a copy of the Police Department's Temporary Custody Record. *Defendant's Exhibit B*. Officer Basner testified that according to this document, he booked Defendant for "signal of intention to turn" and no proof of insurance. Officer Basner acknowledged that the phrase "signal intent to turn" was crossed-out on the document and that someone had written "signal distance required two hundred." Officer Basner stated that a law enforcement support technician probably made this change without his input or authorization. He stated that he did not initial this change, which he normally would do when such a change is made to the record. Officer Basner did not know what authority the technician would have had to change the arrest charge without the arresting officer's authorization to do so.

On re-direct examination, Officer Basner reiterated that he stopped Defendant's vehicle and later arrested him for failure to give a left turn signal. (He also arrested Defendant for no proof of insurance.) The last sentence of the Declaration of Arrest that Officer Basner prepared that day

states: "Due to the above facts/circumstances, he was arrested for turn signal/no proof insurance and booked into CCDC." *Government's Exhibit 2.* The first two sentences of the Declaration of Arrest state the factual basis for this charge as follows: "On 5/4/10 [Officer] S. Basner P#8784 was W/B Tropicana behind [Defendant's vehicle] in the #1 lane when the [vehicle] changed lanes to the center turn lane without signaling. The vehicle turned S/B onto Red Rock St. I conducted a vehicle stop on it . . . ." *Exhibit 2, page 1.*

      Detective James Beatty testified that he has been a detective with the Las Vegas Metropolitan Police Department for just over six years. Since 2009, he has been one of the lead detectives investigating crimes involving credit card skimming devices. Detective Beatty was in his unmarked police vehicle on May 4, 2010 when he was contacted by Officer Basner and requested to come to the scene. On arrival, Officer Basner informed him of the circumstances of the stop. Detective Beatty did not recall whether he advised Mr. Berhe of his *Miranda* rights. He stated, however, that the Defendant did not talk to him. Detective Beatty testified that in addition to the items that Officer Basner found on Defendant, he was also in possession of eleven credit cards. Detective Beatty subsequently determined that five of these cards had electronically encoded account numbers different from the card numbers embossed on the face of the cards.

      Defendant Berhe testified that on May 4, 2010 he was traveling westbound on Tropicana. He stated that he observed Officer Basner's police car a substantial distance before he reached Lindell Street. The police car was traveling in a lane to the right of and behind Mr. Berhe's vehicle when he first observed it. Defendant Berhe stated that all of the drivers in the vicinity were driving at or below the speed limit because of the police car's presence. Defendant Berhe stated that at one point he and the police officer made eye contact. The police car then moved into the lane behind his vehicle and followed him for approximately a half mile. Mr. Berhe stated that he drove carefully so as not to break any law. Mr. Berhe testified that as he approached Red Rock Street, he signaled briefly, for two or three seconds, before moving into the middle turn lane. He then waited for traffic to clear and made a left turn onto Red Rock Street with his left turn signal still activated. The police officer had also made a left turn behind his vehicle and immediately pulled his vehicle over on Red Rock Street.

Mr. Berhe testified that the officer asked him if he knew why he had been pulled over. Mr. Berhe responded no. The officer told him that he had failed to signal two hundred yards before entering the turn lane. The officer asked Mr. Berhe for his license, the vehicle registration and proof of insurance. In addition to providing his license and vehicle registration, Mr. Berhe testified that he provided the officer with a non-owner's proof of insurance card which he carries with him at all times. The officer then went back to his patrol car. Mr. Berhe testified the officer returned very quickly, within two or three minutes. After the officer returned, there was no further discussion of the traffic violations. The officer immediately asked Mr. Berhe if he could search the car. Mr. Berhe said "no, you can't search the car." He asked the officer why he wanted to search the car. The officer responded by asking him if he had anything to hide. Defendant said he had nothing to hide, but just wanted to know why the officer wanted to search the car. The officer told Mr. Berhe that if he had nothing to hide and was a standup citizen, he should have nothing to worry about. Mr. Berhe responded that he could not let the officer search the car because it was not his car, but was his brother's car. The officer then told him to step out of the car.

Defendant Berhe testified that the officer made him go to the front of the patrol car and then searched his person. He stated that the officer did not ask for permission to search his person. Mr. Berhe acknowledged that the officer found the money in his front pocket which Mr. Berhe testified was money to pay his apartment rent. He testified that the officer then put handcuffs on him and placed him in the police car. Prior to being handcuffed and placed in the police car, the officer did not ask him if he had ever been arrested or had failed to appear in court. Mr. Berhe stated that after placing him in the patrol car, the officer went and searched his vehicle. The officer came back to the vehicle with the alleged skimming device and asked Mr. Berhe what it was. Mr. Berhe testified that he told the officer that he did not know; that it looked like some type of gaming device. Mr. Berhe complained to the officer that it was hot in the vehicle and the officer then removed him from the vehicle and had him sit on the curb.

Mr. Berhe testified that an individual in civilian clothes then arrived in a van. This individual asked Defendant if he could talk to him. Mr. Berhe told him that he could not talk to him without a lawyer. Officer Basner then came to Mr. Berhe and told him that he was going to

jail because he would not cooperate and that he could go sit in the hot police car again. Mr. Berhe testified that he was thereafter taken to the detention center. He was released on his own recognizance two hours later. He testified that he asked the clerk at the desk why he had been arrested because no one had told him "yet." She showed him the booking sheet which stated "something about distance signal and no proof of insurance."

## DISCUSSION

The Court separately discusses the constitutional validity of each stop and the resulting searches and searches.

**1.  February 7, 2010 Incident.**

   *A.  Validity of the Stop:*

A police officer who has reasonable suspicion or probable cause to believe that a violation of traffic laws has occurred may stop the vehicle to investigate the infraction. *Whren v. United States*, 517 U.S. 806, 812-3, 116 S.Ct. 1769, 1774 (1996); *United States v. Lopez-Soto*, 205 F. 3d 1101, 1104-05 (9th Cir. 2000). Officer Blackwell testified that he conducted a random computer records check on the license plate of the Defendant's vehicle which was traveling on a public street in North Las Vegas, Nevada. Nevada Revised Statute (NRS) Section 482.545 makes it unlawful to operate an unregistered motor vehicle on the public streets. *See Wright v. State*, 88 Nev. 460, 499 P.2d 1216, 1218 n. 2 (1972) (applying the statute to an automobile with stolen Texas license plates). Officer Blackwell therefore had reasonable suspicion or probable cause to stop Defendant's vehicle based on the computer records check information that the vehicle's California registration was suspended.

   *B.  Validity of Inventory Search:*

In *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092 (1976), the Supreme Court stated that automobiles may be impounded by the police in the interests of public safety and as part of the police department's "community caretaking functions." The Court referenced the impoundment of disabled or damaged automobiles and the impoundment of automobiles that are parked illegally as examples of legitimate exercises of this public safety/community caretaking function. *Opperman*, 428 U.S. at 368-9, 96 S.Ct. at 3097. Once a decision has been made to

impound an automobile, the police may also conduct an inventory search of the automobile. *Id.* at 428 U.S. at 369, 96 S.Ct. at 3092.  The recognized reasons for conducting inventory searches are threefold:  (1) the protection of the vehicle owner's property; (2) the protection of the police against claims by the owner; and (3) the protection of the police from potential danger.  The police may also impound an automobile and conduct an inventory search in an attempt to determine whether it has been stolen and abandoned. *Id.* 428 U.S. at 369, 6 S.Ct. at 3097.  The Court held that inventory searches of impounded vehicles are reasonable under the Fourth Amendment so long as they are conducted pursuant to standard police procedures aimed at securing or protecting the automobile and its contents. *Id.* 428 U.S. at 373, 96 S.Ct. at 3099.

In *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct.738 (1987), the officer searched a backpack found in the automobile of a defendant who had been arrested for driving under the influence of alcohol and whose vehicle was being impounded.  The backpack contained controlled substances, drug paraphernalia and cash.  In upholding the validity of the inventory search, the Court noted that it was conducted in accordance with local police procedures which require a detailed inspection and inventory of impounded vehicles. *Id.* 479 U.S. at 369, 107 S.Ct. at 740.  The Court further stated that there was no showing that the police acted in bad faith or for the sole purpose of criminal investigation.  The Court also stated that the police department procedures mandated the opening of closed containers and the listing of their contents.  In this regard, the Court stated that "[o]ur decisions have always adhered to the requirement that inventories be conducted according to standardized criteria." *Id.* 479 U.S. at 374 n. 6, 107 S.Ct. 742 n. 6.  In *Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632 (1990), the Court stated that "[o]ur view that standardized criteria, *ibid.*, or established routine, *Illinois v. Lafayette*, 640, 648, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983), must regulate the opening of containers found during inventory searches is based on the principle that an inventory must not be a ruse for a general rummaging in order to discover incriminating evidence."  The policy or practice governing inventory searches should be designed to produce an inventory.  The Court stated, however, that this does not require that inventory searches be conducted in a totally mechanical all-or-nothing fashion.  A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in

light of the nature of the search and the characteristics of the container itself.

Inventory search procedures may be oral and do not need to be in writing to be standardized. *United States v. Mancera-Londono*, 912 F.2d 373, 375 (9th Cir. 1990). The failure to follow police procedures or state rules governing inventory searches invalidates a search conducted on that basis. *United States v. Maddox*, 614 F.3d 1046, 1049 (9th Cir. 2010) (officer's decision to impound vehicle did not comply with requirements of Washington statute governing the impoundment of vehicles). Nevada does not have a statute setting forth the exclusive circumstances under which motor vehicles may be impounded and inventory searches conducted.[1] In *Diomampo v. State*, 124 Nev. 414, 185 P.3d 1031(2008), the Nevada Supreme Court upheld an inventory search of a computer case located in a vehicle that was being impounded. The Court stated that the police department's policy authorized the police to impound a vehicle when ownership and right to possession by the driver is in doubt or where an abandoned vehicle causes an immediate threat to other motorists by its location. The Court also held that there was no requirement in the police department's policy that the officers contact the registered owner before conducting an inventory search of the vehicle. *Id.* 124 Nev. at 432-33, 185 P.3d at 1043.

No evidence was introduced at the suppression hearing regarding written policies of the North Las Vegas Police Department relating to impoundment and inventory searches.[2] Officer Blackwell testified that as a matter of policy, a driver with a suspended driver's license is not permitted to drive the vehicle away at the conclusion of a traffic stop. He also testified that it is the policy to impound a vehicle when the police cannot determine who the lawful owner is and that the person operating the vehicle has the owner's permission to do so. Officer Blackwell further testified that once the decision is made to impound a vehicle, a full inventory search of the vehicle

---

[1] Various statutes provide for the impoundment of motor vehicles in particular circumstances. NRS 484E.060, for example, provides for the impoundment of a motor vehicle with a suspended registration that has been involved in an accident.

[2] The North Las Vegas Police Department apparently has a written policy regarding vehicle impoundment and inventory searches. *See Government's Opposition (#41)*, page 9, citing the NLVPD Policy Manual. This manual, however, was not introduced into evidence during the hearing.

is conducted before the vehicle is towed away. Although independent evidence of the North Las Vegas Police Department's policy was not provided at the hearing, Officer Blackwell's testimony appears to be consistent with general public safety or community caretaking considerations relevant to such matters. Officer Blackwell's demeanor as a witness, as well as the content of his testimony, was credible. No attempt was made on cross-examination to impeach his testimony about the existence of these policies. The Court therefore accepts Officer Blackwell's testimony that it is the North Las Vegas Police Department's policy to impound a motor vehicle during a traffic stop when the police cannot determine who the lawful owner is and that the person operating the vehicle has the owner's permission to do so. The Court finds that Officer Blackwell decided to impound the vehicle pursuant to this policy.

The Court also finds that Officer Sharp was a credible witness. Although there were differences between the officers' recollections of events, these differences are neither suspicious nor material. The Court accepts both officers' testimony that Officer Blackwell directed Officer Sharp to perform an inventory search. Although Defendant Berhe disputes that Officer Blackwell gave such an instruction to Officer Sharp, his own testimony is otherwise consistent with a finding that the officers did, in fact, pursue an inventory search. Defendant testified that when he asked Officer Blackwell why Officer Sharp was searching his vehicle, Blackwell told him that they were conducting an inventory search of the vehicle. Defendant Berhe also testified that he earlier heard Officer Blackwell tell Harry during their telephone conversation that he could not let Mr. Berhe drive the car because his license and the vehicle registration were suspended and that he might have to tow the car.

There is no basis on the record in this case to find that the inventory search was simply a pretext to search the vehicle for evidence of criminal activity. There is no indication that Officer Blackwell informed Officer Sharp of any suspicion he had about Mr. Berhe based on his criminal record. Nor is there any evidence that Officer Blackwell or Officer Sharp suspected that the vehicle contained evidence of any specific criminal activity. Officer Sharp testified that he believed that the stop simply involved traffic law violations, that Mr. Berhe would not be arrested and that personal property in the automobile might be turned over to him before it was towed away.

Officer Sharp filled out a vehicle impound form, *Defendant's Exhibit A*, on which he checked the various boxes relating to vehicle equipment and also listed personal property found in the vehicle. The list of personal property included the two laptop computers and the 37 VISA $100 gift cards. Officer Sharp acknowledged that these items should not have been listed on the impound form because they were seized as evidence and did not remain with the vehicle when it was towed to the impound yard. This discrepancy, standing alone, does not invalidate the inventory search.

Finally, the Court concludes that Officer Blackwell had probable cause to seize the encoder device, the gift cards and the computers as evidence that Defendant was engaged in credit card fraud or other criminal activity. The determination of whether a police officer had probable cause to search or seize evidence is based on the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In this case, the officers found a credit card encoding device and numerous unopened credit card gift cards in the vehicle. This discovery, combined with the information that Defendant had previous theft and fraud related arrests and convictions, provided reasonable suspicion that Defendant Berhe was engaged in criminal activity involving fraudulent credit card gift cards. Officer Blackwell's suspicions were further confirmed when Defendant denied that the computers or the gift cards belonged to him despite the fact that he had earlier requested that the computers be turned over to him and documents bearing his photograph and name were found in computer carrying case. The Defendant also denied that he had even touched the items which was again inconsistent with his previous request and with the fact that his identification documents were located in the carrying case. Based on these circumstances, Officer Blackwell had probable cause to seize the items as evidence of criminal activity.

### 2. May 4, 2010 Incident.

The Government has the burden of proving by a preponderance of the evidence that Officer Basner had lawful grounds to stop Defendant's vehicle and that his subsequent search of Defendant's person complied with the Fourth Amendment. *United States v. Cortez-Rivera*, 454 F.3d 1031, 1041-42 (9th Cir. 2006); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991)

(per curiam); and *United States v. Marshall*, 488 F.2d 1169, 1186 (9th Cir. 1973).  The determination in this case turns primarily on the issue of credibility.  The Court does not place much stock in Defendant Berhe's credibility.  Officer Basner, however, is not necessarily a more believable witness.  His demeanor as a witness was poor and he did not come across as a particularly truthful witness.  The Court also finds that material aspects of his testimony are simply not credible.

The Court does not believe Officer Basner's testimony that Defendant Berhe gave him permission to search his person.  Defendant Berhe had previously been convicted for felony crimes involving forgery or other fraudulent conduct.  Only three months earlier on February 7, 2010, Defendant Berhe's automobile had been stopped by Officer Blackwell.  On that occasion, Mr. Berhe was confronted with an alleged credit card encoder device that was found in the vehicle he was driving, and he was arrested.  Officer Basner allegedly stopped Mr. Berhe's vehicle for failing to make a left turn signal.  According to Officer Basner, Mr. Berhe lied to him during their initial contact when Officer Basner asked him if he had previously been arrested.  After running a records check on Mr. Berhe, Officer Basner returned to Mr. Berhe's vehicle and asked him why he had lied.  Mr. Berhe did not respond.  Officer Basner then allegedly asked Mr. Berhe for permission to search his person, which he claims Mr. Berhe readily granted.  At that point Mr. Berhe had no reason to believe he had been stopped for anything other than a minor traffic violation.  He also allegedly knew, however, that he had an electronic skimming device in one front pocket and $1,500 in twenty dollar bills in the other front pocket.  Given his previous convictions for fraud crimes and his recent arrest by Officer Blackwell, Mr. Berhe must have been aware that he would probably again be arrested and charged with additional crimes if the skimming device was found on his person.

While individuals engaged in criminal activity sometimes engage in behavior that is inexplicable from the viewpoint of their own advantage, it is highly unlikely that Mr. Berhe would have consented to a search of his person under these circumstances.  Officer Basner could, of course, have verified Mr. Berhe's consent, if such was actually given, by having him sign a consent to search form. He did not do so.  Officer Basner's testimony regarding this matter is simply not

credible. Because the Court concludes that the Government has failed to prove that Defendant consented to a search of his person, it does not address whether the alleged consent was voluntary under the factors set forth in *United States v. Cormier*, 220 F.3d 1102, 1112 (9th Cir. 2000) and other cases.

The Government argues that even if the search of Defendant's person is not upheld on the grounds that it was consensual, the evidence discovered during that search should not be suppressed based on the inevitable discovery doctrine. *See United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986). The Government asserts that because Officer Basner decided to arrest Mr. Berhe for the misdemeanor traffic violations, the skimming device, cash and fraudulent credit cards on his person would have inevitably been discovered during a search incident to arrest or during booking at the jail. Officer Basner indicated that he made the decision to arrest Mr. Berhe after he had already searched his person and found the cash and skimming device. He testified, however, that he would have arrested Defendant regardless of whether he consented to a search of his person and regardless of the discovery of the items found during the search.

The parties dispute whether Officer Basner's decision to arrest Mr. Berhe pursuant to the police department's misdemeanor arrest policy was justified based on his prior record of failures to appear. The police department policy permits an officer to arrest an individual if the officer has reason to believe that he or she will not keep a promise to appear. In *Virginia v. Moore*, 553 U.S. 164, 128 S.Ct. 1598 (2008), two police officers arrested the defendant for driving with a suspended driver's license. The officers then searched the defendant incident to arrest and found cocaine on his person. Under Virginia law, driving on a suspended license was not an arrestable offense "except as to those who 'fail or refuse to discontinue' the violation, and those whom the officer reasonably believes to be likely to disregard a summons, or likely to harm themselves or others." *Id.* at 553 U.S. at 167, 128 S.Ct. at 1602. Because none of these circumstances applied, the Virginia Supreme Court held that defendant's arrest was unlawful under state law and therefore violated the Fourth Amendment. The United States Supreme Court disagreed and held that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire,

state restrictions do not alter the Fourth Amendment's protections." *Id.* 553 U.S. at 176, 128 S.Ct. at 1607.  The Court also noted that in a long line of cases it has held that when an officer has probable cause to believe that a person has committed even a minor crime in his presence, the arrest is constitutionally reasonable. *Id.* 553 U.S. at 171, 128 S.Ct. at 1604.  *See also Martinez-Medina v. Holder*, — F.3d —, 2011 WL 85571 at *7-*8 (9th Cir. 2011).  Therefore, Officer Basner's decision to arrest Mr. Berhe did not violate the Fourth Amendment so long as he had probable cause to believe that Defendant had committed a misdemeanor offense in his presence.

This brings the Court back to the question of whether Officer Basner had probable cause to stop Defendant's vehicle for failing to give a left turn signal as required by NRS 484B.413 and Clark County Code Section 14.32.040.  The statute and code require a driver to give an appropriate signal before turning left if any other vehicle may be affected by the movement.  The signal must also be given not less than the last one hundred feet traveled by the vehicle before turning.  Officer Basner testified Defendant's vehicle entered the center turn lane and then make a left turn without signaling.  Defendant testified that he put his turn signal on before entering the center turn lane and kept it on as he made the left turn onto Red Rock Street.  Defendant Berhe is not a reliable or necessarily believable witness.  The Court, however, also has substantial doubts regarding Officer Basner's veracity and, under the circumstances, does not give his testimony greater weight than that of the Defendant.  Accordingly, the Court finds that the Government has not met its burden by a preponderance of the evidence to establish that Officer Basner had reasonable suspicion or probable cause to stop Defendant's vehicle for failing to properly signal a left turn.

## CONCLUSION

Based on the foregoing, the Court concludes that the North Las Vegas Police lawfully stopped, impounded and conducted an inventory search of the vehicle operated by Defendant during the incident on February 7, 2010.  The officers' discovery and seizure of evidence of criminal activity relating to fraudulent credit card gift cards, therefore, did not violate the Fourth Amendment.  The Government, however, has failed to prove that Officer Basner had reasonable suspicion or probable cause to stop Defendant's vehicle on May 4, 2010.  Because the stop of Defendant's vehicle was unlawful, the discovery of evidence of criminal activity resulting from that

stop is inadmissible and should be suppressed. Accordingly,

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Defendant Berhe's Motion to Suppress Evidence for Fourth Amendment Violation (#33) be **denied** in regard to the evidence seized as a result of the stop and search and seizure that occurred on February 7, 2010; and

**IT IS RECOMMENDED** that Defendant Berhe's Motion to Suppress Evidence for Fourth Amendment Violation (#33) be **granted** in regard to the evidence seized as a result of the stop and search and seizure that occurred on May 4, 2010.

## **NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 10th day of June, 2011.

_George Foley Jr._
GEORGE FOLEY, JR.
United States Magistrate Judge